Mr. Justice Cox
delivered the opinion of the court.
To state the essential part of pleadings in this cause in‘ the most condensed form, the bill alleges that the defendants, Joseph B. Close, Wm. S. Humphreys, S. R. Evans and Geo. Clendenin, combined for their own private gain and established a cemetery near Washington, and for that purpose purchased a tract of land, the title of which was temporarily conveyed to Humphreys ; that said parties procured an act of Congress to be passed on the 27th of July, 1854, to incorporate the proprietors of Glenwood Cemetery Co.; that of the twelve persons named as corporators, eight were resi *97 dents of the District of Columbia, and the last named four were the defendants, Close. Humphreys and Evans, and one Phelps, all residing out of the District of Columbia; that according to said charter, the affairs of the company were to be managed by four managers to be elected annually by the proprietors, and until an election the four last named corporators aforesaid were to be the managers; that none of the eight residents of the District have been allowed any share in the management, but said Close, Humphreys, Phelps and Evans, organized themselves as the corporation, accepted the charter, elected Close president and the others as managers, and George Clendenin as superintendent, and they have ever since managed the institution for their private gain. That the land purchased containing about ninety acres was formally dedicated to the purpose of a cemetery on the 2d of August, 1854, and rules and regulations published for the government of the cemetery, and that Humphreys thereafter conveyed the legal title, which was temporarily in him, to said Close, who thereby became trustee for the corporation; that said parties sold lots for burial purposes to over twelve hundred persons, and received the proceeds, the certificates or deeds being under the corporate seal, and signed by Close, as president; that the cemetery being greatly mismanaged, the lot owners applied to Congress for an amendment to the charter, whereupon Congress passed an amendment in February, 1877, providing for the election of three trustees by the lot holders and two by the original proprietors, for the future management of the cemetery ; that thereupon the lot holders elected Jno. McLelland, S. H. Morsell and T. W. Bartley trustees, and requested Close to appoint two others, w'hieh he refused to do, denying the existence of the corporation and claiming the property as his own ; that at an annual meeting, the lot holders elected Bartley, McLelland and George W. Cochran as a permanent board of trustees, and on the continued refusal of Close to appoint the two others, filled the vacancies by the election of Lewis Clephane and George T. Keen ; that the board removed Clendenin from his office of superintendent, and de *98 manded possession of the books, papers and other property, which he has refused to surrender. That the defendant, since- the amendment to the charter, has collected income from the sales of lots and applied it to his own use, and divested the whole property from the use of the corporation.
It prays that Close may be compelled to execute his trust> and conveying the property to the corporation ; and the defendant may account for all moneys received since the amendment of the charter, and may be enjoined from any further interference, &c.
The answer of Close denies that the Glenwood Cemetery Company is a corporation, and that he co-operated with Humphreys in procuring the passage of the act of incorporation ; denies all knowledge of any acceptance of or organization under the charter or any election of officers thereunder, and avers that he became satisfied upon inquiry in 1876 that no such acceptance or organization took place-It admits the formal dedication, the publication and circulation of the pamphlet by the direction of Humphreys alone, but denies the legal effect attributed to these facts, and that he became trustee of the property for the company. It denies the alleged mismanagement, and the validity of the act of Congress amending the charter, as far as it seeks to divest him of his property without compensation. It admits the sales to numerous lot holders and their rights to their lots.
It admits that he instructed Clendenin not to surrender the property to the trustees elected by the lot holders. It admits the sale of lots since the amended charter, and the receipt of the proceeds, but denies his accountability for them. It shows the legal title to be vested in him, and denies the right of the purchasers of lots to any part of the sixty acres not laid out into lots, or to any unsold lots or their proceeds.
Clendenin also filed an answer, which it is unnecessary to notice. One Borcheling, receiver in a suit between Close and his wife, and claiming under assignment from Close for *99 the benefit of his wi'V allowed to be made a party defendant, and to file an answer.
The decree required Joseph B. Close to convey a title in fee simple to the thirty acres now laid out into burial lots to the company, and that he and Clendenin deliver up all books, property and effects belonging to the cemetery within thirty days, and be enjoined from hereafter interfering with the plaintiff in the management, and that an account should be taken of receipts and expenditures by Clendenin since March 17, 1877, and that the trustees should hereafter yearly, on the first Monday of June, pay over to Joseph B. Close, the original proprietor, one-fourth of the gross receipts from sales of lots, to be in place of the capital stock provided for in the original charter—saving the rights and interests of Mrs. Close.
From this decree Close appealed.
The facts relating to the the title of the property in controversy were as follows: On the 2d of June, 1852, the tract of land, now known as Glenwood Cemetery, was purchased by William S. Humphreys, of New York, from James J. Boyle, of Washington, for $9,000, and conveyed to Humphreys by deed of that date. On the 7th of April, 1853, Humphreys conveyed to the defendant, Joseph B. Close, of New York, an undivided moiety of the tract in fee simple. This deed, though absolute in form, was, in fact, a mortgage, and intended as security for some $20,000, which Close claims to have advanced to Humphreys. On the 22d day of June, 1854, Humphrej's conveyed the entire tract to Close in fee simple with covenants of title.
Meanwhile Close claims to have advanced some $7,000 more to Humphreys. At the time of the execution of the last deed, an agreement was made between them, that Close would indorse the paper of Humphreys, and if the latter should provide for it and meet his obligations to Close, he should have back a moiety of this property and they should own it in common. In 1858 or 1859 Humphreys, having failed to meet his engagements, relinquished his interest in the property, and Close remained the sole proprietor under *100 this title. At the time of his advances to Humphreys, Close was informed that they were to be used in the conversion of this property into a cemetery.
Until the final settlement, in 1858 or 1859, Close seems to have considered himself as mere mortgagee as to one moiety of the property, and Humphreys, who wras in possession, as a mortgagor, and as to the other moiety of which he was the absolute owner, he regarded Humphreys as his agent and left to him the entire management, including the disbursements of all moneys spent in the development of the property. P. 51, dep. of deft.
On the 27th of July, 1854, an act of Congress was passed, entitled “An act to incorporate the proprietors of Glenwood Cemetery.”
The defendant Close claims that this act was procured by Humphreys without his knowledge. It declares twelve persons who are named, and of whom the defendant Joseph B. Close was one, to be a body politic and corporate by the name and title of “ The Proprietors of Glenwood Cemetery in the District of Columbia.”
This charter authorizes the corporation to purchase and hold not more than one hundred acres of land north of the city of Washington, provided that at least thirty acres shall be forever appropriated and set apart as a cemetery. It empowers the managers to lay out and ornament the grounds, dispose of burial lots, make by-laws, &c. It directs that until an election of managers shall be had according to its provisions, the last four persons named in the act (among whom were Humphreys and Close) shall be the managers of the corporation. It further enacts that the land of the company dedicated to the purposes of a cemetery shall not be subject to taxation.
On the 2d of August the formal ceremony of dedicating the cemetery took place, in the presence of a large.concourse of people, with religious services and addresses.
Immediately after, a pamphlet was published, containing a copy of the charter, a narrative of the proceeding of dedication (in which the property is described as containing *101 ninety acres, of which thirty were then fully prepared for interments), the names of the managers and officers (of which latter Close was named as president, Humphreys as treasurer, and Clendenin, one of the defendants, and brother-in-law of Humphreys’, as superintendent), and the by-laws, of which the first declares that “ all lots shall be héld in pursuance of an act to incorporate the Proprietors of Glenwood Cemetery, approved July 27, 1854.”
This pamphlet was not only generally circulated, but specially sent to all the purchasers of lots afterwards.
It also came to the hands of Close about the time it was issued, or shortly after ; and he admits that he made no objection to the appropriation ‘of the property in the manner shown, as he likewise admits that he never made objection to any part of Humphreys’ proceedings, although he denies any knowledge of them at the time they transpired.
With the full knowledge on the part of Close, then, that this publication was at least in existence, Humphreys, either in the character of mortgagor in possession, or as agent of Close, proceeded to sell the lots and receive the purchase money.
In the course of twenty years Close executed nearly or quite 2,000 certificates or deeds of lots, w'hich he signed as president of the company, and which bore the seal of the company, and on which w’ere printed the by-laws, the first of which, as already stated, declared that the lots “ shall be held in pursuance of the act of Congress,” &c.
All this was a full ratification and adoption of Humphreys’ previous management and disposition of the property, as far as any authority from Close is needed.
It is perfectly apparent, then, that the sale of these lots was accompanied with explicit representations to the purchasers—
1. That this property was dedicated to the purposes of a cemetery in its entirety.
2. That the lots w'ere to be held in pursuance of the charter, i. e., w7ere to be under the protection and subject to the requirements of the charter, and, consequently, that the *102 charter was in force, and, consequently, further, that the corporation was in existence and Close was its president.
I leave out of view other significant facts, such as the claim of exemption from taxation for the whole tract, because this was not addressed to the lot holders. If, at this late day, Close can be allowed, as against the lot owners, to deny the existence of the corporation, and assert a private ownership of this property inconsistent with the dedication before mentioned, there must be a grave defect in the ethics of the law or in the machinery of justice.
We hold him irrevocably committed in favor of the lot owners, to a recognition of this original charter as in force, and of the legal consequences of it.
It is true that the existence of a grant of corporate franchises from the Government is not made out by estoppel. But that is not the question here. The grant from the United States was complete, without resorting to an estoppel. The completion of the corporation after that was merely an in pais, and on that an estoppel may exist. The defendant Close after proclaiming himself the president of an existing corporation through a period of twenty years, is clearly es-topped, in our judgment, from now asserting the contrary against those who have dealt with him on the faith of this declaration. But this is not all; if the original charter is to be considered in force for any purpose, it is for all. The lots cannot be held in pursuance of the charter, as the lot holders were notified, unless it be so in force. Then, the reservation of the right to Congress to alter, modify or repeal the charter is also in force. The alteration made by the amended charter was perfectly in harmony with the objects of the original charter, and absolutely required to protect the interests of the lot holders. Under the first charter, the managers were to be elected by the original proprietors of the ground. But by the sale of lots, this proprietorship was changing to the lot holders, and just in proportion to the sales, the interest of these original proprietors was disappearing. With this change of interests, it was eminently proper that a change of management should *103 take place, and that the managers should, in part, be elected by the lot holders. It certainly tended to carry into effect the object of the charter, which was to preserve this property as a cemetery, for all time, because when the lots are all sold, the lots holders alone are interested in that object, and the original proprietors cease to have any interest in it. We think this amendment, then, a legitimate consequence of the vitality of the original charter, and that the course of conduct pursued by Close has committed him in favor of the lot holders, as much to this and to the recognition of the corporation as recognized, as it does to the recognition of the original charter as still in force. And when it is said that the estoppel can only operate in favor of the lot holders, and not in favor of the corporation, we answer, 1, that the estoppel compels him to recognize the corporation ; and, 2, that the lot holders and the corporation are the same ; it is their organ and representative and agent, and, as such is entitled to the benefit of this equitable estoppel.
Whatever, then, may be the proof as to actual organization of the corporation under the original charter, we hold that, as against the defendant Close, the corporation as reorganized under the amendment, is lawfully in court, for the enforcement of his obligations in respect to the cemetery for the benefit of the lot holders. But in the opinion of a part of the court, at least, the facts that Close has for twenty years acted as the incumbent of a corporate office, using the corporate seal, and that Humphreys and Clendenin have likewise professedly exercised such offices also, are evidence sufficient of an actual organization under the charter.
Let us now inquire what are these obligations of Close : What is the legal effect of the acts before mentioned, in the direction of a dedication of this property to the use of others than the proprietors? What is the nature of the alleged dedication ?
It has been argued, that the fee-simple title of property cannot pass by dedication ; that there was no dedication here to the public or to any charitable use, or to the lot owners, because at the time of the ceremony of dedication there were none such, &c.
*104 It is not necessary to controvert these propositions.
The kind of dedication that can be claimed may be illustrated by examples given in the American note to Dovaston vs. Payne, 2 Smith’s Leading Cases.
“This (it is said), if one owning land exhibits a map of it, on which a street is defined, though not as yet opened, and building lots be sold by him with reference to a front or rear on that street, or lots be conveyed, being described as by-streets, this is an immediate dedication of the streets, and the purchasers of lots have a right to have that street thrown open forever.”
Again, “if the owner of laud lays out and establishes a town, and makes and exhibits a plan of the town, with various plats of spare ground, such as streets, alleys, quays, &c., and sells the lots with clear reference to that plan, the purchasers of the lots acquire, as appurtenant to their lots, every easement, privilege and advantage, which the plan represents as belonging to them as a part of the town,” &c., &c.
These general principles have been applied to the very case of a public cemetery in the case of Hunter vs. The Trustees of Sandy Hill, 6 Hill (N. Y.), 407, which was an action of ejectment to recover ground that bad been used as a public cemetery. The court .said, “ Dedication, the term used in reference to this subject, is the act of devoting or giving property for some proper object and in such manner as to conclude the owner. The law which governs such eases is anomalous. Uuder it rights are parted with and acquired in mode and by means unusual and peculiar. Ordinarily, some conveyance or written instrument is required to transmit a title to real property, but the law applicable to dedications is different. A dedication may be made without writing, by act in pais as well as by deed'. It is not necessary that the owner should part with the title which he has, for dedication has respect to the possession and ends the personal estate. Its effect is not to deprive a party of title to his land, but to estop him while the dedication continues in force, from asserting that right of exclusive possession and enjoyment which the owner of property ordinarily has.”
*105 “This being a case to which law of dedication applies, the use for which the dedication was made must determine the extent of the right parted with by the owner of the land and acquired by the public, where, as in the case of a highway, the public acquire but a mere right of passage, the owner, who makes the dedication, retains the right to use the land in any way compatible with the full enjoyment of the public easement. But the case is widely different here. The land in question was dedicated as a graveyard and the ashes of the dead should be allowed to repose in undisturbed solitude and quiet.”
So, in this case, the mere ceremonial of dedication, as it was called, before referred to, had no legal effect whatever ; Close might still have recalled the property from its proposed destination,. But when nearly or quite two thousand grave lots were sold on the faith of the representations we have spoken of, the dedication was complete and the lot owners acquired a right to every easement, privilege and advantage which was held out to them as a part of the scheme. But there was something more in this case than the mere dedication of an easement. This, alone, would not affect the fee simple title. There were acts besides, which amounted to the creation of trust, which the party may be compelled to give effect to.
It was one of the most prominent of the representations made to these purchasers that the Grlenwood Cemetery Company was the owner of this property. Every deed was made in the name of the company and under its seal, and all the by-laws and regulations speak in its name as the owner. One of the commonest illustrations of constructive fraud and implied trust in the books, is the case where one having title to property simply stands by and is silent when another deals with it as if that title did not exist, and in ignorance of it. The party thus omitting to disclose his rights is precluded from asserting them afterwards to the prejudice of the party misled by his silence. 1 Story’s Eq. Jur., Secs. 385 to 391.
Still more conspicuous is the fraud of affirmatively pro *106 claiming and reiterating the title of another as was practiced here, and inducing parties to act upon such proclamation, and afterwards asserting rights inconsistent with that title. The application of this to the present case is apparent. It will not suffice to say that this only entitles the lot holders to have their own titles to lots made good through the corporation, because the title was asserted in the corporation not for that object only, but for all the objects contemplated in the charter, to wit: the administration of the whole property, and that perpetually, for the purposes of this cemetery. We hold it clear, then, that Close is bound in equity to transfer this property to the corporation, in the interest of the lot holders. We do not mean to say that he is estopped from claiming further compensation for the land, for this is not inconsistent with the right of the corporation to hold and manage the property.
The argument for the defence admits the dedication so far as to bind the owner not to divert the thirty acres from the intended use, and to entitle the lot holders to have the property perpetually held and used for the purposes of sepulture.
To us it seems to go further. It was held out to the lot-holders not only that the ground immediately available for burial should remain set apart for that object, but that the cemetery should be forever under the protection of a perpetual corporation, charged with the duty of laying out and ornamenting the grounds, capable of receiving gifts and bequests, and empowered to make by-laws for the regulation of the affairs of the corporation, and the whole property was described as dedicated to the purposes of the cemetery—not, necessarily, that the whole should be laid out into lots—but that it should all belong to the institution and be available for its general objects.
This was not to be a mere graveyard in which each lot-holder acquired a piece of ground in which to bury his dead, and at the same become chargeable with the sole care of his particular lot, but the lot-holders themselves became subject to by-laws and regulations having reference to the institu *107 tion as an entirety and the perpetual preservation of the cemetery as an ornamental and convenient place for interment and for resort by the relatives of the dead. All this, too, requires and involves a permanent provision for the expenses of such an institution.
The scheme is not to be gratified by a mere application of the proceeds of sales of lots to current expenses, while the surplus is diverted to other objects, or the mere profit of the projectors of the enterprise ; and, therefore, this dedication involves a pledge of the resources of this institution, as far as necessary to its preservation and perpetuation. It was in this faith that the lot holders bought, and certainly with no idea that the corporation would sell all the lots, appropriate the entire proceeds, then declare itself dissolved, and leave the lot-holders to assess themselves for all the future needs of the cemetery. So much for the rights and legitimate expectations of the lot-holders.
Now let us consider the rights of the original proprietors of the ground.
The charter is entitled “An act to incorporate the Proprietors of Glenwood Cemetery,” and it incorporates certain twelve persons by name, including the defendant, Joseph B. Close, and authorizes them to purchase not exceeding one hundred acres. It evidently contemplated that these parties would purchase and become the proprietors of the land to be used as a cemetery. It further authorized the creation of capital stock to the nominal amount of $100,000, to be divided among these parties according to their respective interests: that is, the capital stock issued to each should represent his proprietary interest in the property. It was. clearly intended that the stock should represent a pecuniary value, and not that these purchasers should devote the property so to be bought by them gratuitously to the purposes of a cemetery. One of the difficulties of the case is that Congress omitted to say how far the property or the stock, which was to be its representative, should be a source of profit; from what source its dividends were to be derived, and what should be their limit. Yet, that the proprietors *108 of the property were to be compensated in some way for the property out of the sales of lots, seems clear from the very fact that they were to receive capital stock in proportion to their respective interests in the land.
Now, as matters turned out, these corporators did not purchase the land' in question, but the defendant (Close) assumed to act as the entire corporation and the owner of the land at the same time. As the owner of the land he has not parted with the legal title to the corporation, nor been paid any stipulated price for it. Had the coiporation been regularly organized it would have negotiated with him for the purchase of the land ; he might have fixed his price and sold or have refused to sell, and the corporation might equally have refused to purchase. Without waiting for such organization he has appropriated and administered the property as if it had been transferred to the corporation,, until it has passed beyond his control. He is no longer in a position to dictate terms or fix his own valuation or his interest. Hut if the land is not yet paid for, it is evident that he has an interest of value which cannot be taken from him without compenstation.
Although, as we have seen, he is bound to make the title good in the corporation, he is still entitled to say that, as the owner of .the land, he has not been compensated for it, and to have this judicially determined.